

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 31, 2015**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| American Housing Foundation, | § | Case No.: 09-20232-RLJ |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| Walter O'Cheskey, Trustee of the AHF Liquidating Trust | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 11-02133-RLJ |
| | § | |
| Paul King, et al. | § | |
| | § | |
| Defendants. | § | |

1

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Commencing on July 28, 2014, and continuing on July 29, 2014, October 15, 2014, and October 16, 2014, the Court conducted a trial in the above-captioned adversary proceeding. Appearing at trial were counsel for Walter O'Cheskey, Trustee of the AHF Liquidating Trust (Trustee), counsel for Paul King, counsel for the Estate of Frances Maddox and Heron Land Company, and other appearances as noted in the record. The Court has reviewed and considered the arguments of counsel, the testimony of witnesses, the exhibits admitted into evidence at trial, and the documents and pleadings filed in connection with the adversary. Based upon the record, the Court now finds and concludes as follows, pursuant to Federal Rule of Civil Procedure 52, made applicable in the adversary by Federal Rule of Bankruptcy Procedure 7052.

### I. Findings of Fact
### The AHF Bankruptcy

1.      On April 21, 2009, creditors of American Housing Foundation (AHF) filed an involuntary petition against AHF under chapter 11 of the Bankruptcy Code [Case No. 09-20232]. On June 11, 2009, AHF filed a voluntary chapter 11 petition [Case No. 09-20373].

2.      On July 17, 2009, the Court consolidated the voluntary and involuntary cases pursuant to Federal Rule of Bankruptcy Procedure 1015(a).

3.      On April 29, 2010, the Court appointed Walter O'Cheskey as the chapter 11 trustee.

4.      On December 6, 2010, the Trustee and the Official Committee of Unsecured Creditors filed the Second Amended Joint Chapter 11 Plan.

5.      On December 8, 2010, the Court entered an order that confirmed the plan.

6.      Under the terms of the plan and the confirmation order, O'Cheskey was appointed Trustee of the AHF Liquidating Trust, which was likewise established under the plan.

7.      As Trustee of the AHF Liquidating Trust, O'Cheskey was vested with the authority

2

and right to prosecute and settle bankruptcy-estate causes of action, including the causes of action here asserted.

### Defendants' Claims and Trustee's Complaint

8.      The defendants filed proofs of claim in the AHF bankruptcy proceedings related to their equity investments in LIHTC Walden II Development, Ltd. (Walden II).

9.      The defendants' claims were for the following amounts, including attorneys' fees:

| Defendant | Claim |
|---|---|
| Paul King (King) | $302,765 |
| Heron Land Company (Heron) | $706,448 |
| Frances Maddox Estate (Maddox Estate) | $522,875 |

10.      On April 19, 2012, the Trustee filed the Trustee's First Amended Complaint against the defendants (and other defendants that have settled with the Trustee) which objects to the defendants' claims and asserts avoidable preferential and fraudulent transfers of $245,820.[1]  Docket No. 70.  The transfers were issued from an account of an AHF-related entity, AHF Development, Ltd. (AHF-D).

### The Deals

11.      The defendants invested the following amounts on the following dates in exchange for limited partnership interests in Walden II:

| Defendant | Equity Investment | Date of Investment |
|---|---|---|
| King | $300,000 | 09/11/08 |
| Heron | $500,000 | 10/02/07 |
|  | $200,000 | 09/11/08 |
| Maddox | $500,000 | 10/05/07 |
| Total Investments: | $1,500,000 | |

---

[1] *See infra* note 2.

12.     Article VI of the Walden II Partnership Agreement provides that the limited partners "shall be entitled" to:

    (a)     a return of their "Initial Capital Contribution" within twelve months, plus

    (b)     18% preferential return on the "Initial Capital Contribution."

13.     The Walden II Partnership Agreement also provide the following definitions:

    (a)     Initial Capital Contribution: "the amount of cash, and the fair market value of property or services, contributed to the Partnership by a Partner, prior to the Effective Date."

    (b)     Effective Date: "the date the Certificate of Limited Partnership … is filed with the Secretary of State of Texas."

14.     The Walden II Certificate of Limited Partnership was filed with the Secretary of State of Texas on August 20, 2007.

15.     The defendants made no contributions to Walden II prior to August 20, 2007.

16.     On September 15, 2008, King executed a Walden II Partnership Agreement and became a limited partner in Walden II.

17.     On September 24, 2007 and September 11, 2008, Heron executed a Walden II Partnership Agreement and became a limited partner in Walden II.

18.     On September 25, 2007, Mrs. Maddox signed a Walden II Partnership Agreement and became a limited partner in Walden II.

19.     The general partners of Walden II were AHF and Multi-Family Rehab Partners (MFRP).  MFRP was a Texas general partnership, with AHF as its managing general partner.

20.     Paragraph 6.4 of the Walden II Partnership Agreement contains a guaranty by the general partners (AHF and MFRP) that they would contribute to Walden II any amounts necessary to enable it to pay the limited partner the return of investment and the preferential return.

21.     In addition, AHF and MFRP executed separate guaranty agreements to each defendant for each investment listed above.  Each of those separate guaranty agreements:

4

- defined the "Investment" as the amount of each investment by each defendant.

- defined the "Payment" as "Return of Investment within twelve (12) months of investment, plus a preferential return of eighteen percent (18%) per annum until such amount is paid in full."

- stated the purpose, intent, and consideration for the guaranty agreement "[t]o induce Investor to enter into the [Walden II Partnership] Agreement, to make the investment, and for further consideration . . . ."

- promised that "Guarantor guarantees the performance of [Walden II's] obligations under Article VI of the [Walden II Partnership] Agreement."

- provided that "[t]his is a primary, irrevocable, and unconditional guaranty of payment and performance and not of collection and is independent of [Walden II's] obligations under the Agreement."

- promised that "Guarantor will make all payments to Investor at Investor's address set forth in the Agreement."

22.     The Walden II guaranties were executed within two years of the filing of both the AHF involuntary petition and AHF's voluntary petition.

23.     The Walden II guaranties were executed while AHF was insolvent.

24.     Walden II had no bank account, assets, employees, office, furniture, phone, or business operations.

25.     The parties intended for the "Initial Capital Contributions" as identified in Exhibit "A" to the Walden II Partnership Agreement to mean just that. The amounts invested by the defendants are listed as "Initial Capital Contributions" on Exhibit A.

26.     Alternatively, the definition of "Initial Capital Contribution" in ¶ 1.6(e) of the Walden II Partnership Agreement contains a scrivener's error.

27.     Alternatively, the definition of "Initial Capital Contribution" in ¶ 1.6(e) of the Walden II Partnership Agreement constitutes a mutual mistake of the parties.

**Tax Deductions from the Deals**

Walden II 2007 Tax Return

28.     The 2007 Walden II federal income tax return reflects a $5,750,000 ordinary loss from AHF-D.

29.     Walden II owned no interest in AHF-D.

30.     The 2007 AHF-D tax return reflects no Walden II ownership in AHF-D and reflects an ordinary business loss of only $5,004.

Maddox 2007 Tax Deductions

31.     The 2007 Walden II K-1 to Maddox is marked "Final K-1" and reflects:

    (a)     that Maddox made a $500,000 capital contribution to Walden II in 2007,

    (b)     an ordinary business loss deduction to Maddox of $500,003.

32.     The Maddox 2007 tax return claims a "non-passive loss from Schedule K-1" of $500,000 from Walden II.

33.     Maddox was a passive investor in Walden II.

34.     Walden II did not cease operations in 2007.  Maddox did not sell or transfer her partnership interest in Walden II in 2007.

Heron 2007 Tax Deductions

35.     The 2007 Walden II K-1 to Heron is marked "Final K-1" and reflects:

    (a)     that Heron made a $500,000 capital contribution to Walden II in 2007, and

    (b)     an ordinary business loss deduction to Heron of $500,005 from Walden II.

36.     The Heron 2007 tax return claims a $500,000 ordinary loss deduction from Walden II.

37.     Heron was a passive investor in Walden II.

38.     As stated, Walden II did not cease operations in 2007.  Heron did not sell or transfer its partnership interest in Walden II in 2007.

Walden II 2008 Tax Return

39.     The 2008 Walden II tax return reflects a $3,950,000 ordinary loss from AHF-D.

King 2008 Tax Deductions

40.     The 2008 Walden II K-1 to King is also marked "Final K-1" and reflects:

    (a)     that King made a $300,000 capital contribution to Walden II in 2008, and

    (b)     a $300,000 ordinary loss deduction to King from Walden II.

41. King's 2008 tax return reflects a $300,000 non-passive loss from Walden II.

42. King was a passive investor in Walden II.

43. Walden II did not cease operations in 2008. King did not sell or transfer his partnership interest in Walden II in 2008.

Heron 2008 Tax Deductions

44. The 2008 Walden II K-1 to Heron is marked "Final K-1" and reflects:

(a) that Heron made a $200,000 capital contribution to Walden II in 2008, and

(b) an ordinary business loss of $200,000 from Walden II.

45. Heron's 2008 tax return records a $200,000 ordinary loss deduction from Walden II.

46. Heron was a passive investor in Walden II.

47. As stated, Walden II did not cease operations in 2008. Heron did not sell or transfer its partnership interest in Walden II in 2008.

**The Payments**

48. Defendants were paid the preferential return payments as follows:

| Paid to | Date | Amount |
|---------|----------|------------|
| Maddox | 01/14/08 | $22,500.00 |
| Heron | 01/14/08 | $22,500.00 |
| Heron | 04/01/08 | $22,191.79 |
| Maddox | 04/01/08 | $22,191.79 |
| Heron | 07/08/08 | $22,500.00 |
| Maddox | 07/08/08 | $22,500.00 |
| Heron | 10/06/08 | $22,500.00 |
| Heron | 10/06/08 | $ 1,775.00 |
| Maddox | 10/06/08 | $22,500.00 |
| King | 10/06/08 | $ 2,663.00 |
| Heron | 01/01/09 | $22,500.00 |
| Heron | 01/01/09 | $ 9,000.00 |
| King | 01/01/09 | $13,500.00 |
| | | $228,821.58[2] |

All of these payments were drawn off the AHF-D bank account.

_____

[2] Exhibit B to the Trustee's Complaint reflects a $17,000 payment made to Frances Maddox on September 19, 2007. At trial, the parties agreed that the $17,000 payment was simply a mistake. The Trustee agreed that the $17,000 should be deducted from the Trustee's record of payments made to Maddox.

**AHF and Steve Sterquell**

49.     The debtor, AHF, was a qualified 501(c)(3) non-profit entity whose purported mission and purpose was to acquire, develop, rehabilitate, and manage qualified low-income housing projects.

50.     AHF directly or indirectly owned interests in numerous specially created entities—limited partnerships and limited liability companies—that in turn owned and operated approximately 66 apartment complexes located in nine states; the apartment complexes accounted for over 14,000 units.

51.     The various entities were formed to own "affordable" housing complexes and, in particular, to provide limited partner/tax-credit partners and AHF with real-estate-investment opportunities.

52.     AHF's non-profit status ostensibly exempted its affiliated properties from income, sales, and property taxes; and qualified its projects for certain tax incentives and government housing programs.

53.     Steve W. Sterquell (Sterquell), a CPA, was the president and founder of AHF.  Sterquell was in control of AHF and the entities AHF controlled.

**Roles of Robert Templeton**

54.     Robert Templeton (Templeton) is the attorney that represented Paul King in this action. He was also the main fact witness called by the Trustee and the defendants to testify to the transactions at issue.  Templeton has a long-standing relationship with each of the parties.  He is the brother-in-law to King (and thus the brother of King's wife, Mary Tom King).  Templeton was the attorney for Frances Maddox and her husband, Dr. W.A. Maddox, for 50 years; upon her death in November of 2008, he was named the executor of the Frances Maddox Estate.  Defendant Heron is a Texas corporation presently owned by Luanne Boyd and Linda Cunyus, who are the daughters of Templeton and his wife, Martha Templeton.  At the time of Heron's investments, however, Templeton owned 60% of Heron and his daughters owned the remaining 40%.  He was also president of Heron.

8

55.    Templeton himself invested $3.5 million in the Walden II partnership deals and claimed

a like amount ($3.5 million) in tax deductions derived from such investments.  These investments

were, like the deals here, made in 2007 and 2008.  And similar to the deals here, Templeton was issued

an unconditional, absolute right to repayment of the loss-generating investment and an 18% return on

the amounts invested.  Tax deductions were taken to offset an approximate $8+ million gain he had

realized on the 2007 sale of his interest in an oil and gas company, Luxor Oil and Gas, Inc.

56.    Templeton invested several million more dollars in AHF-related deals with concomitant

tax deductions—charitable or loss deductions—in virtually identical amounts.

57.    Templeton could provide no plausible explanation for how the invested dollars—either

his or those of the defendants here—could be used to legitimately realize the panoply of benefits they

were promised.  He knew Walden II had no assets other than the invested dollars.  Beyond that, he

could not account for the overriding generosity of the proposed deals other than vague generalizations

about how Sterquell could use the invested dollars as "soft money" for redevelopment of low income

housing projects that would somehow give rise to low income housing tax credits.  Templeton could

not explain the basic substance of how the deals would work.  He testified that he looked to the

guaranties provided and the asserted $80 million net worth of AHF.  He disavowed any specific

knowledge of how the invested funds would be used; he did, however, in an *attempt* to explain the

deals, testify that the invested dollars would be "placed" with another entity and thus generate a

receivable back to the partnership, Walden II.

58.    In particular, when asked how Walden II would have the income sufficient to pay the

18% quarterly returns on the invested dollars, Templeton did not have an answer.  (He in fact said he

(the questioning attorney) would have to ask Sterquell.)

59.    As for the tax implications, Templeton testified that, for example, $100,000 was "put

up" and was to be repaid by the end of the year, with an 18% return.  He said the funds were to be

"expensed out basically, and I would get an ordinary loss deduction for that year of $100,000." The loss deduction and the 18% quarterly returns were realized in the same year that the investment was made. Then, after a 12-month period had lapsed, i.e., the next year, he would be paid the $100,000, which was to be treated as a capital gain.

60.     Templeton admitted that an 18% return *and* large tax deductions realized from the same invested dollars was "too good to be true" and that he wished he had consulted with a tax accountant at the time he entered into the investments.

61.     Templeton fully understood then that the proposed investments were too good to be true. He basically gave Sterquell carte blanche to use the funds as he saw fit; Templeton wanted the range and magnitude of benefits that he and the other defendants here were to receive. Templeton knew or should have known that, for example, a $500,000 investment cannot simultaneously give rise to a loss deduction of like sum with a repayment promise of the same amount and a return of 18%.

62.     In late March 2009, in connection with his investments with Sterquell and AHF, Templeton signed as maker two bogus, backdated non-recourse promissory notes, one for approximately $920,000 and the other for $2.5 million. Templeton received nothing—either a loan or other consideration—in return for the notes. These were signed "for tax purposes." Just two weeks prior, on March 12, 2009, he had Maddox Estate loan $500,000 to AHF. This loan forms the basis of yet another claim made in the AHF bankruptcy case by Maddox Estate. This claim has not been objected to.

63.     Templeton's investments that were made in late August 2007 came due under the terms of the partnership agreement one year later in August 2008. The invested sum was not repaid, however. Templeton testified that he did not declare a default because it was not required. He also said that an "indefinite extension" was granted, though there was no written confirmation of such extension.

10

64.     Templeton confirmed that the deductions obtained by him and the defendants here from Walden II, as evidenced by K-1s issued by Walden II to them as investors, were improper.  The so-called losses that were passed on from AHF-D were invalid as Walden II held no interest in AHF-D and therefore was not entitled to any pass-through losses from such entity.

65.     Templeton is an experienced trial lawyer; he has been actively practicing law since he graduated from law school in 1954.  He has received many awards and recognitions as a lawyer.

66.     Templeton possesses a grasp of the complex business structure of the AHF enterprise and its many complicated transactions.

67.     Templeton understands the differences in corporate and other legal forms and the different tax and liability implications that flow from them.  He understands the general and technical legal differences between loans and equity investments.

**The Defendants**

Paul King

68.      Paul King is a retired dentist; Templeton introduced King and his wife, Mary Tom King, to Sterquell (and AHF) and encouraged them to confer with Sterquell about investing their savings in Sterquell's housing foundation.

69.      On September 11, 2008, Sterquell met with King at his home in Houston, Texas; Sterquell signed and delivered to King a Walden II Partnership Agreement and a separate guaranty agreement from AHF, and collected King's $300,000 investment on that same day.

70.     On September 15, 2008, King signed a Walden II Partnership Agreement and thus became a limited partner.  (Sterquell had, as president of AHF, signed the agreement on September 9, 2008; he had also signed a guaranty, guaranteeing the amount invested.)

71.     AHF made the quarterly preferential return payments to King until approximately January 1, 2009.

72.     By letter dated April 30, 2009, from King to Templeton, King enclosed his schedule K-1 from Walden II and a copy of his 2007 tax return.  He inquired of Templeton about how they could "pull off taking the $300,000 lose [sic] back three years" that he, King, "thought . . . was important."  Trustee's Ex. 314.  The letter belies King's testimony that his investment in Walden II was based solely on the promised 18% return and specifically not anticipated tax benefits.  Templeton also testified that it was "possible" that he discussed potential tax benefits with King prior to King's investment.

Maddox Estate

73.     Templeton recommended and arranged for Mrs. Maddox to invest in Walden II.  Maddox would not have made the investment without Templeton's approval and endorsement.

74.     Frances Maddox made an investment of $500,000.00 in September of 2007 to Walden II, pursuant to a Walden II Partnership Agreement.  On September 25, 2007, she signed a Walden II Partnership Agreement and became a limited partner.  AHF, MFRP, and Sterquell each signed guaranties guaranteeing payment of the $500,000.  Sterquell, on behalf of and as president of AHF, signed an unconditional guaranty to Frances Maddox dated August 20, 2007.

75.     Templeton handled the $500,000 investment by Frances Maddox through a wire transfer from an account on which he was the signatory.  Maddox was in her mid-nineties, had had a stroke, and was living in an assisted living facility at the time of the investment.

76.     Frances Maddox died on November 14, 2008.  Her husband, Dr. W.A. Maddox, predeceased her.  As stated, Templeton is the independent executor of the Maddox Estate.  Don Buckley was the accountant for Frances Maddox and advised her on financial matters, including Walden II.

77.     AHF made the quarterly preferential return payments to Frances Maddox and her estate until approximately January 1, 2009.

78.    Templeton set-up the Frances Maddox Foundation for Frances Maddox during her life and is its president.

Heron Land Company

79.    As stated above, Heron is a Texas corporation presently owned by Templeton's daughters, Luanne Boyd and Linda Cunyus.

80.    Heron is a subchapter S corporation, which is a tax "pass through" entity.

81.    Heron was originally formed for Frances Maddox's use, but was later purchased by Templeton and his daughters, Linda and Luanne.

82.    Templeton caused Heron to invest in Walden II by making capital contributions that were guaranteed by AHF, MFRP, and Sterquell.  Heron provided $500,000 to Walden II in September of 2007, and $200,000 in January of 2008, pursuant to the Walden II Partnership Agreement.

83.    On September 24, 2007, Templeton signed, for Heron, a Walden II Partnership Agreement and Heron became a limited partner.  Templeton, again for Heron, signed a Walden II Partnership Agreement, as restated, on September 11, 2008.

84.    On August 20, 2007 and September 9, 2008, respectively, Sterquell, as president and on behalf of AHF, executed guaranties of payment of the sums invested—the $700,000—in Walden II by Heron.

85.    AHF made the quarterly preferential return payments to Heron until approximately January 1, 2009.

86.    As the majority owner and president of Heron, Templeton made the decision for and effected Heron's $700,000 in aggregate investments made in 2007 and 2008.

87.    The investments by King and Frances Maddox (now the Maddox Estate) were made on Templeton's recommendation.  Though Templeton did not make the decision for them or without their respective approvals, they would not have invested in Walden II had it not had Templeton's

13

endorsement and recommendation.

### Testimony of Alan Weiner

88.     Alan Weiner, an expert called by the Trustee, testified and provided his opinion of

AHF's solvency during the time frames relevant to the issues here. Mr. Weiner is certainly qualified to

render such an opinion. Weiner holds a Bachelor of Science in Computer and Informational Science

degree from the University of Florida; he holds an MBA from the Wharton School at the University of

Pennsylvania. Weiner is the managing director of Focus Management Group, a company that provides

consulting and management services to companies in financial distress. Focus was employed by AHF

during its chapter 11 bankruptcy case, with Weiner serving as the primary person responsible for

Focus's services. Weiner was instrumental in AHF obtaining confirmation of its chapter 11 plan and,

more important, was responsible for the management and ultimate planned disposition of the dozens of

properties that were under AHF's umbrella. Weiner no doubt has more and greater knowledge of

AHF's operations, both prior to and during the bankruptcy proceedings, than any other person. He has

prior experience as an investment banker, particularly involving real estate companies; he has, in

addition, worked on deals involving low-income housing projects. Weiner has testified several times

before this Court.

89.     In assessing AHF's solvency over the years preceding its bankruptcy, Weiner employed

a methodology that considered an overall assessment of AHF's complicated balance sheet. AHF was

an asserted non-profit entity that sat at the top of the so-called affordable housing enterprise. It

included approximately 65 separate entities—limited liability companies and limited partnerships—

each of which owned its own property, mostly apartment complexes. There were over 14,000 units

within these projects. AHF generally served, either directly or indirectly, as the controlling member

(as to the LLCs) or general partner (of the limited partnerships). The entire enterprise flowed up to and

was controlled by Sterquell who was the principal and person in sole control of AHF.

90. Weiner assessed the potential values of the particular ventures, as reflected by the hard assets—the real estate properties—and the liabilities of such individual entities. The net equity values flowed up and were attributable to AHF. The properties—and thus the single asset LLCs or limited partnerships—were categorized by how they were financed. Thirteen properties were conventionally financed, i.e., notes and mortgages; seventeen properties were financed by pooled investor groups lured in with allocated tax credits; thirty-five projects were financed through the issuance of tax exempt bonds. Weiner employed an income capitalization method with a cap rate as a way to derive a present valuation for each of the properties. This approach is justified by considering what an arms-length investor would pay for the stream of income generated by the properties. Weiner used a cap rate of 8% to 10% in his analysis. In assessing the liabilities of the seventeen tax credit properties, Weiner took into account the guaranties issued by AHF to investors. The issued guaranties, according to Weiner, might include an operating deficit guarantee, a tax credit delivery guarantee, a tax credit recapture guarantee, a repurchase guarantee, and a guarantee of maintenance of a real estate tax exemption. Such guaranties, per Weiner, are common with deals structured with the use of tax credits. They are also different from the types of guaranties issued in the transactions at issue here. The guaranties here, for example, are unconditional promises to repay the amount of invested dollars by the defendants; though labelled as guaranties, they are substantively the same as promissory notes.

91. In formulating his opinion, Weiner used the definition and concept of "insolvency" as set forth in the Bankruptcy Code. The Code adopts a traditional balance sheet test that looks at the sum of the debtor's debts relative to the value of all of the debtor's property, at a fair valuation. *See* 11 U.S.C. § 101(32)(A).

92. Weiner concluded that property subject of the tax exempt and bond financings had no value flowing up to AHF.

93. Weiner concluded, further, that AHF, as a result of the guaranties it issued, had

substantial liabilities to investors in the tax credit partnerships, all of which were formed from 1997 through 2004.

94.     Weiner concluded that AHF had some attributable value from receivables owed it by the tax credit entities. But it also had several notes payable to various financial institutions.

95.     Weiner concluded from his detailed analysis that AHF was insolvent during the period from December 31, 2006 through December 31, 2008.

96.     The Court finds that Weiner was qualified, both by education and experience, to render his opinion and that the methodology he used was fair, reliable, and reasonable. In addition, Weiner was intimately familiar with the properties, the complicated financing mechanisms, and the history of AHF and its enterprise. The defendants objected to Weiner's failure to use or obtain full-blown real estate appraisals in arriving at net equity values for the 60-plus apartment complexes. This is simply unrealistic for an assessment of *AHF's value* for purposes of a solvency analysis.

## AHF Development

97.     AHF-D was created as a Texas limited partnership in 1998 with AHF as the general partner and the "Schooler-Koehler Family" members and entities as its limited partners. (Members of the Schooler and Koehler families were party-defendants in Adversary No. 11-02132 that was tried before this Court.)

98.     Funds that were ostensibly invested in AHF or its affiliated entities, and funds paid out to investors, including the transfers made to the defendants here, flowed through an account owned by AHF-D. Weiner analyzed the bank records for this account, and he also reviewed the assets and operations of AHF-D. Weiner confirmed that AHF-D had no employees, no business operations, no office, and no office furniture or equipment. AHF-D had only the bank account. Sterquell used this account to make payments to investors, to make payroll of AHF, and to pay other bills of AHF. All signatories on this account were employees of AHF.

99. He confirmed that AHF-D never owned nor leased any office space. And, based on his review of AHF's records, it never properly served as a financial intermediary, as defendants asserted, for so-called tax-deferred real estate sales by an individual, Matt Malouf. All funds placed with AHF (or AHF-D) by Malouf were immediately spent by AHF.

100. Weiner concluded that Sterquell and AHF employees had complete dominion and control over the AHF-D account and that the funds passing through this account were the property of AHF. The use of AHF-D furthered the AHF enterprise. Weiner further opined that Sterquell and AHF used the AHF-D account as a means to avoid scrutiny of certain transactions that were effected by use of the account. The account was therefore beyond the scrutiny of regular auditors of AHF. As a result, AHF-D was not part of the consolidated audit of AHF. Weiner testified that the account was used to keep properties afloat, properties that were part of AHF's affordable housing enterprise. AHF, through Sterquell, directed the use of the funds from the AHF-D account.

101. Michele Abdoo, a former employee and controller for AHF, and the person in charge of AHF's bookkeeping, testified that AHF-D had no employees, no business operations, and no equipment or furniture; she confirmed that it did have a bank account, which is the account through which invested dollars and payments flowed.

102. Each of the defendants have previously taken the position in the AHF bankruptcy case that "both AHF and AHF Development were controlled and used primarily for the benefit of Steve Sterquell. . . . Sterquell managed both entities." Trustee's Exhibit 603 ¶ 12. They further stated that "[t]here was commingling of funds to such an extent to conclude that AHF Development operated merely as another bank account for the benefit of AHF." *Id*.

103. On August 17, 2011, this Court found that "[AHF-D] conducted no business operations and provided no goods or services . . . ," "$140 million passed through [AHF-D] . . . ," and "[AHF-D] was nothing more than a conduit bank account." *In re AHF Dev., Ltd.*, 462 B.R. 186, 200 (Bankr.

N.D. Tex. 2011). The defendants did not appeal the Court's decision. In both *Rice Trust* and *Templeton*, the Court iterated that the funds of AHF-D were in fact the funds of AHF, and the finding is the same here. *O'Cheskey v. Templeton (In re Am. Hous. Found.)*, No. 10-02016, 2013 WL 1316723, *19 (Bankr. N.D. Tex. Mar. 30, 2013), *aff'd*, 2014 WL 1599929 (N.D. Tex. Apr. 11, 2014), *appeal docketed*, No. 14-10563 (5th Cir. May 9, 2014); *O'Cheskey v. Rice Trust (In re Am. Hous. Found.)*, No. 11-02006, 2012 WL 5430988, *7 (Bankr. N.D. Tex. Nov. 7, 2012).

104.    The defendants argue that the Court's refusal to substantively consolidate AHF-D with AHF supports their argument that AHF-D was a viable, operating business and thus not a mere conduit bank account of AHF. This is a specious argument and mischaracterizes the Court's ruling on the substantive consolidation issue. The question of whether AHF-D should have been consolidated with AHF arose from the joint motion of the then Official Unsecured Creditors Committee of AHF, AHF (as then debtor-in-possession), and certain investors. The investors included Templeton, King, Maddox, and Heron Land Company. Hearing was held on March 4, 2011. But substantive consolidation was not the sole issue before the Court. In addition, and joined with such motion, was a motion to dismiss brought by the United States Trustee and two creditors, Attebury Family Partnership, LP and the 2001 Scott D. Rice Trust.

105.    The Court's opinion [Trustee's Ex. 611], entered August 17, 2011, ordered dismissal of the AHF-D bankruptcy case [Case No. 09-20703]. It had been placed in bankruptcy by AHF when AHF was still debtor-in-possession. The reasons for the filing are set forth in greater detail in the opinion, but, basically, one goal in filing the AHF-D case was to ultimately consolidate AHF-D with AHF and thus eliminate a potential $16 million receivable ostensibly owed by AHF to AHF-D.

106.    The grounds for dismissal were in many respects the same as the grounds for substantive consolidation—that AHF-D was essentially a non-entity, with no employees; it had no business operations and no assets apart from the referenced $16 million receivable. In the opinion, the

18

Court noted that though AHF-D was placed in bankruptcy by AHF, it had no counsel representing it in the chapter 11 case, it failed to file operating reports, it never paid a quarterly filing fee to the U.S. Trustee, it had not filed 2008 or 2009 tax returns, and, most important, it had no business to reorganize and engaged in no activity whatsoever. There was no corporate resolution authorizing AHF-D's filing, and no debtor-in-possession bank account was ever set-up. The Court in fact found that AHF-D had no employees and that it had no reasonable likelihood of filing and obtaining confirmation of a plan of reorganization. With respect to the referenced $16 million claim that AHF-D ostensibly had against AHF, the Court found that *AHF actually filed a proof of claim for $16 million in AHF-D's case*, but that such claim had no supporting documentation and that it was signed by the attorney acting for both AHF and AHF-D. The Court surmised that AHF-D, had it ever existed in any substantive way, had possibly dissolved by virtue of AHF's bankruptcy filing as AHF was its stated general partner.

107.    The Court found that AHF-D did have a bank account in its name but that the signatories were all AHF employees. This account, however, was closed in March 2009, several months prior to the bankruptcy filing of AHF-D. AHF-D filed a tax return in 2006, but such return reflected no income. The Court noted that Attebury made a loan issued to AHF-D, which had been renewed or extended multiple times; Attebury considered AHF as a "bankruptcy remote entity" and he looked to the AHF "enterprise" as the source of repayment of the loan.

108.    The Court was ultimately faced with a choice of whether to consolidate the two filed cases or to simply dismiss the AHF-D case as requested by the U.S. Trustee. The Court stated that it was "asked to forego the statutorily mandated remedy of dismissal in favor of the equitable remedy of substantive consolidation" and framed the issue with this question: "Should the Court tolerate a filing made without any intention or ability to comply with the Bankruptcy Code?" The Court simply concluded that dismissal was required and was the fair and more practical remedy under the circumstances.

19

### Sterquell's Suicide

109.    Well before AHF's involuntary filing, Sterquell's (and AHF's) enterprise was in deep

trouble.  The affordable housing model had failed, and AHF and its many affiliates could not begin to

handle the obligations they had and promises made.  AHF and its affiliates were involved in many

questionable deals.  Sterquell no doubt succumbed to the pressures and problems confronting him.  On

April 1, 2009, he was killed in a one-car wreck that was ruled to be a suicide.

## II.  CONCLUSIONS OF LAW

### Jurisdiction and Venue

1.    The Court has jurisdiction over the complaint and the causes of action asserted herein

under 28 U.S.C. §§ 157(a) and (b) and 1334.

2.    The causes of action asserted herein are core proceedings under 28 U.S.C. §§ 157(b).

3.    Venue of this action is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

4.    This Court has the power and is authorized to provide the requested relief

pursuant to §§ 105, 502(d), 510(b), 510(c), 544, 547(b), 548, and 550 of the Bankruptcy Code.  In the

event a superior court determines that some or all of the causes of action here are not core proceedings

or not properly subject of this Court's authority, these findings and conclusions are submitted as

proposed findings and conclusions.  *See Stern v. Marshall*, 131 S. Ct. 2594 (2011) (addressing

constitutional authority of bankruptcy court); *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct.

2165 (2014) (holding that bankruptcy court may issue proposed findings and conclusions in a core

proceeding over which the bankruptcy court does not have constitutional authority); *In re BP RE, L.P.*,

735 F.3d 279 (5th Cir. 2013) (holding parties cannot consent to final adjudication by bankruptcy court

in a non-core, related-to proceeding); and *Galaz v. Galaz (In re Galaz)*, 765 F.3d 426 (5th Cir. 2014)

(holding district court may treat bankruptcy court's findings and conclusions as proposed).

### Causes of Action

5.    By this action, the Trustee objects to the defendants' proofs of claim—King's

unsecured claim of $302,765, Heron's unsecured claim of $706,448, and Maddox Estate's unsecured claim of $522,875. The claims are based on the equity investments made by each defendant and the guaranties issued by AHF in connection with each investment. The defendants' claims also state that AHF, through Sterquell, made multiple misrepresentations to them regarding the investments; that Sterquell, as president of AHF, breached fiduciary duties owed to them; and that Sterquell and AHF violated the Texas Theft Liability Act. Defendants submit that such conduct constituted common law fraud and that they are entitled to imposition of a constructive trust and equitable lien "on all funds and assets of the debtor that are traceable from" the funds received by AHF from each defendant.

6.      The Trustee says the defendants' claims are contractually invalid under the terms of the Walden II Partnership Agreement and guaranties; but if deemed valid, the Trustee contends that the guaranties should be set aside as fraudulent obligations—either actually or constructively fraudulent— under federal and state law; failing under his fraudulent obligation charges, the Trustee submits that the claims should be subordinated under either § 510(b) (mandatory subordination) or § 510(c) (equitable subordination). The Trustee asserts that he is entitled to equitable relief, arguing that the defendants have "unclean hands" as a result of their participation, by their investments, in Sterquell's (and thus AHF's) illegitimate tax and Ponzi schemes.

7.      In addition to the claims objections, the Trustee submits that the $228,821.58 in payments to the defendants are voidable as fraudulent transfers—based on both actual fraud and constructive fraud, under §§ 548 and 544 (incorporating state law) of the Bankruptcy Code—and as preference payments under § 547.

## Characterization of Claims

8.      The transactions that give rise to the defendants' claims here are substantively identical. Each defendant made a significant capital contribution; for this, a limited partnership interest in Walden II was assigned to each defendant in return. The contributions were made *after* the effective date of the partnership, determined by its filing with the Secretary of State of Texas.

9.      The guaranties issued by AHF in connection with each investment provide that AHF was unconditionally obligated to repay the amount of the investment within twelve months, plus a preferential return of 18% per annum.  The guaranty, therefore, goes beyond a promise to purchase the partnership interest from each defendant.  As a result, in return for the capital investment, each defendant was entitled to the following benefits:

- a partnership interest in the limited partnership;

- an unconditional promise of repayment of the amount invested;

- an unconditional promise of periodic payments of a preferential return of 18% per annum on the amount invested;

- the usual benefits—the upside of a profitable enterprise, as well as potential pass-through tax benefits—but not the risks associated with an investment; in fact, as structured, there was *no risk as to liability* for the amount of the investment.

10.      To address the defendants' claims and the Trustee's causes of action, the Court must first determine the real nature of the deals.  For this, the Court looks to both the form and the substance of the deals and construes each deal as an integrated whole.  The Court may "delve behind the form of transactions and relationships to determine the substance."  *Wyle v. ABCD Enters. (In re United Energy Corp.)*, 944 F.2d 589, 596 (9th Cir. 1991) (citations omitted).  The partnership agreement, guaranties, and other instruments evidencing each of the investments were, within each deal, intimately intertwined.  Analyzing one instrument is pointless without consideration of the others.  *See id.*  And, most important, the benefits received and the expectations of defendants from their respective deals flowed from a single investment, i.e., the invested dollars were not allocated as among the various benefits and promises flowing back to the defendants.

11.      For the capital contributions made here to Walden II, each investor-defendant received *both* an interest in the partnership *and* a promise of repayment of the invested amount.  This sum accrued interest at 18%.  The guaranty from AHF refers back to the partnership agreement and partnership obligation.  As structured, the investments bore no risk as to liability.

22

12.     These were bogus deals. There were no properties in which the funds were invested, and the partnership, Walden II, apart from the capital contributions made here, had no other assets.

13.     The defendants seek recovery from AHF, and thus the Court must characterize the nature of the deals here. The Bankruptcy Code addresses real claims—secured, priority, administrative, unsecured—and equity interests. "It does not have a category for strange, hybrid-type arrangements as exist here." *O'Cheskey v. Rice Trust (In re Am. Hous. Found.)*, No. 11-02006, 2012 WL 4622310, *11 (Bankr. N.D. Tex. Sept. 30, 2012). The Court considers the defendants' claims against AHF. The guaranties issued by AHF are the instruments that create the primary basis for the defendants' claims. But the guaranties cannot be isolated and considered apart from the other parts of the transactions that arose in connection with the defendants' contributions. The circumstances here make recharacterization a threshold consideration.

14.     The Fifth Circuit in *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539 (5th Cir. 2011), held that bankruptcy courts have the ability to recharacterize debt as equity. *Id.*

> When a creditor files a timely claim, the Code states that "the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount, except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." 11 U.S.C. § 502(b). The Supreme Court has held that the "applicable law" is state law: "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979). As a result, "there is no reason why such [state law] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. at 55, 99 S. Ct. at 918. Our analysis of "applicable law" under § 502(b) is therefore an application of state law, unless Congress has stated otherwise.

> Taken together, *Butner* and § 502(b) support the bankruptcy courts' authority to recharacterize claims. If a claim asserts a debt that is contrary to state law, the bankruptcy court may not allow the claim. Moreover, where the reason for such disallowance is that state law classifies the interest as equity rather than debt, then implementing state law as envisioned in *Butner* requires different treatment than simply disallowing the claim. The Fourth Circuit identified the inadequacy of traditional disallowance in noting that "[w]hen a bankruptcy court disallows a claim, the claim is completely discharged. By contrast, recharacterization is appropriate when the claimant has some rights via-a-vis the bankrupt." *In re Dornier Aviation, Inc.*, 453 F.3d 225, 232 (4th Cir.2006) (internal citation omitted; emphasis in original). These rights,

fixed by state law, are not irrelevant to the court's decision to disallow a claim. To the contrary, recharacterizing the claim as an equity interest is the logical outcome of the reason for disallowing it as debt.

*Lothian Oil*, 650 F.3d at 543.

15. The Court looks to Texas state law to determine whether each of the deals was an investment that created, at most, an equity claim or was a loan subject now to treatment as an unsecured claim. *See* 11 U.S.C. § 502(b); *see also Lothian Oil*, 650 F.3d 539. In this regard, Texas courts have looked to the multi-factored tests from federal tax law cases. *Lothian Oil*, 650 F.3d at 544. These include a 16-factor test as set forth in *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968); a 13-factor test from *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); and an 11-factor test from *Jones v. United States*, 659 F.2d 618, 622 n.12 (5th Cir. 1981).

16. As with other factor-driven tests, the Court reviews the evidence in light of all factors, "while realizing that the various factors are not of equal significance and that no one factor is controlling." *Lothian Oil*, 650 F.3d at 544 (quoting *Mixon*, 464 F.2d at 402). Additionally, the various factors "are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty*, 398 F.2d at 697.

17. Factors considered are the following:

(1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.* at 696. Yet additional factors are the name or title of the instrument, if any, memorializing the deal,

*Mixon*, 464 F.2d at 402, and the right to enforce payment of principal and interest, *Jones*, 659 F.2d at 622 n.12.

18.     On a more basic level, the Court notes that creditors and investors are distinguishable in the way they each view the solvency or insolvency of the enterprise with which they are dealing. *Official Comm. of Unsecured Creditors v. Fli Deep Marine LLC (In re Deep Marine Holdings, Inc.)*, No. 10-03116, 2011 WL 160595, *5 (Bankr. S.D. Tex. Jan. 19, 2011).  For example, if the enterprise prospers, a creditor expects nothing more than repayment of its fixed debt.  *Id.*  In fact, the creditors rely on the *equity* provided by the company's investors.  *Id.* at *6.  Investors, however, look to share in profits to the exclusion of creditors.  *Id.* at *5.  The flip side of this expectation is the enhanced risk of insolvency borne by investors.  *Id.*  The subordination provisions of the Bankruptcy Code, both § 510(b) (mandatory subordination of damage claims arising from purchase of a security) and the absolute priority rule set forth at § 1129(b) (providing that "unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated," *SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411, 420 n.5 (5th Cir. 2009)), are said to arise from these basic expectations and thus the very nature of investments compared to loans.  Accordingly, the risk of the illegality in issuance of equity is properly borne solely by investors because "it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors."  *Deep Marine*, 2011 WL 160595, at *6 (quoting *SeaQuest*, 579 F.3d at 420).

19.     The intent of the parties is muddled.  They intended for the investment to be both a risk-laden capital contribution and a risk-free, at least as to liability, promise of repayment.

20.     The identity and relationship between contracting parties is an important factor.  If the parties do not negotiate at arms length, a court should be wary of them trying to "mold" a transaction

into a financially amorphous product that can conveniently be either a loan or an investment. *See Fin Hay*, 398 F.2d at 697. Here, any "negotiation" regarding these deals and the structure of the transactions—the creation of the Walden II Limited Partnership as the vehicle through which the investments were made, the terms of the Walden II Partnership Agreement, its ownership arrangements with AHF, Sterquell, and MFRP as guarantors—was between Sterquell and Templeton. Sterquell and Templeton had a close and long-standing relationship; they were involved together in other questionable deals that resulted in improper and invalid tax deductions claimed by Templeton. Sterquell has been described as brilliant and charismatic. As stated, Templeton understands the differences between loans and equity investments. Both sides understood the absurdly beneficial nature of the investments. Sterquell had to know these deals were questionable; if the defendants did not so realize, they, both themselves and through Templeton, should have known.

21. Another factor concerns the amount of capital the recipient had at the time of the transaction. If the recipient was capitally thin, then the transaction weighs towards an equity investment. *See Jones*, 659 F.2d at 622; *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 751 (6th Cir. 2001). With each of the deals here, the defendants were contributing capital for a newly created limited partnership. AHF was an asserted non-profit entity that sat at the top of the enterprise that included dozens of for-profit companies or partnerships. Many of the deals orchestrated by Sterquell were complex and legally questionable. The Court can safely assume that Walden II and AHF were capitally thin. It is also important to note that the invested funds were controlled by Sterquell (and, by association, arguably AHF) and used for whatever purpose Sterquell saw fit.

22. The "risk involved" in the transaction typically considers the presence or lack of security. Absence of security is a "strong indication that the advances were capital contributions rather than loans." *See id*. at 752. Apart from the guaranties, there was no collateral or other security behind

26

the deals.

23.     The formal indicia is relevant to the inquiry.  On their face, the deals were structured as formal equity investments.

24.     The defendants were passive investors.  They did not participate in management of Walden II or specifically direct the use of the funds they contributed to the partnership.

25.     As set forth above, the investments did provide for a "preferential return" of 18% per annum.  Preferential return payments were made to the defendants; they were not repaid their invested contributions upon which the returns were calculated, however.

26.     Though these transactions were clearly structured on their face as equity investments, the Walden II Partnership Agreement and the guaranties contain terms that eliminated any contingency as to the obligation to repay the amount invested.

27.     The evidence does not describe any redemptive rights of the defendants.

28.     The timing of the investments corresponds with the formation of the partnership and the guaranties issued in connection with the investments.

29.     The evidence is devoid of any plausible explanation of the source of either the preferential payments that were to be made or for the repayment of the invested dollars.

30.     The Walden II Partnership Agreement referred to an obligation to repay the invested amounts in twelve months, though this obligation was not met and no effort was made to enforce the repayment obligation.

31.     In assessing the above factors and upon consideration of the very nature of investments compared to true loans, the Court concludes that the investments here must be characterized as equity investments, just as they were so designated.  The characterization encompasses the guaranties issued by AHF.  The defendants were relatively sophisticated parties that understood the distinction between loans and capital investments.  The risk associated with an investment lies with the investor.  The

27

characterization recognizes that the defendants put up real dollars and thus had some rights vis-à-vis the bankrupt. *See Lothian Oil*, 650 F.3d at 543. "[I]t is the typical outcome of the reason for disallowing it as debt." *Id.*; *see also AutoStyle Plastics*, 269 F.3d at 748–49.

### Subordination of Claims

32.     The defendants' contract-based claims—arising from the investments made and the guaranties—are subordinated to the claims of unsecured creditors. *See* 11 U.S.C. § 510(b); *see also O'Cheskey v. Koehler (In re Am. Hous. Found.)*, 499 B.R. 517, 539–40 (Bankr. N.D. Tex. 2013). So, too, are all other claims asserted by the defendants that arise from their investments. *Id.*

33.     The Court concludes in the alternative that Walden II was an affiliate of AHF.

34.     The Code defines an affiliate to include a "person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor . . . ." 11 U.S.C. § 101(2)(C). A "person" under the Code includes partnerships and corporations. 11 U.S.C. § 101(41).

35.     A limited partnership can be considered the affiliate of a general partner when there is a leasing or operating agreement in place. *In re SemCrude, L.P.*, 436 B.R. 317, 320–21 (Bankr. D. Del. 2010) (holding that the limited partnership was not an affiliate of the general partner when there was no lease or operating agreement in existence and the limited partnership agreement was executed by two non-debtors); *In re Minton Grp., Inc.*, 27 B.R. 385, 389 (Bankr. S.D.N.Y. 1983) (holding that a limited partnership was an affiliate of a general partner when the general partner "operate[d] all of the business and manage[d] all of the property of the limited partnership under a limited partnership agreement.").

36.     Walden II is a limited partnership with two general partners: AHF and MFRP. MFRP was a Texas general partnership with AHF as its managing general partner. AHF, in essence, operated as the sole general partner of Walden II and exercised full control of its operations. Although there

was no document titled operating agreement, the Walden II Partnership Agreement described the role of the general partners. Part II of the Walden II Partnership Agreement delineated the general partners' duties and authority, employment of third parties, fiduciary responsibility, reliance of limited partners on the general partners, inquiries, and limitations. The Court finds that the Walden II Partnership Agreement, which was executed by the limited partnership and the general partners, satisfies the requirement that an operating agreement existed with AHF. *See Minton*, 27 B.R. at 389.

37.     The defendants each acquired a limited partnership interest for their respective investments. The promises contained in the Walden II Partnership Agreement to repay the *amount* of the defendants' investments have no loan or lender on the other side. This simple fact also undermines the guaranties issued by AHF: a guaranty is a promise to answer for the payment of a debt of another; and without a debt, there can be no valid guaranty. Under Texas law, a guaranty "creates a secondary obligation under which the guarantor promises to answer for the debt of another and may be called upon to perform once the primary obligor fails to perform." *Jamshed v. McLane Express Inc.*, 449 S.W.3d 871, 877 (Tex. App.—El Paso 2014); *see also Altus Brands II, LLC v. Alexander*, 435 S.W.3d 432, 442 (Tex. App.—Dallas 2014). Furthermore, a guaranty must be supported by consideration, which must be independent of the obligation. *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 262 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citations omitted).

38.     The above conclusions 33 to 37 are not intended to limit the Court's determination that each defendant's catalogue of benefits received for their investments—the partnership interests, repayment promises, preferential returns, and tax benefits—is the equity security received by each defendant. *See O'Cheskey v. Koehler*, 499 B.R. at 540.

### Good Faith Defense - § 548(c)
### (Additional Conclusions for Fraudulent Obligations / Transfers)

39.     The Trustee seeks the avoidance of fraudulent obligations and avoidance and recovery

of fraudulent transfers related to the defendants' investments in Walden II.  The subject of these

actions involves the guaranties given by AHF to the defendants and subsequent payments that the

defendants received from AHF as "returns" on their respective contributions to Walden II.  Section

548(c) provides that "a transferee or obligee of such a transfer or obligation that takes for *value* and in

*good faith* has a lien on or may retain any interest transferred or may enforce any obligation incurred

. . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer

or obligation."  11 U.S.C. § 548(c) (emphasis added).

     40.     The Trustee argues that the defendants are not entitled to the good faith defense because

they knew or should have known of the fraudulent nature of the deals they entered into.  To support

this argument, the Trustee labels Templeton as the agent of the defendants and contends that

Templeton's knowledge should be imputed to the defendants.  Basically, the Trustee contends that

because Templeton was the agent of the defendants and lacked good faith, so too did the defendants.

The Trustee imputes Templeton's knowledge to the defendants.

     41.     To prevail under the good faith defense, each defendant must show that "he took value

in good faith," and "[t]o keep what he received, he must subsequently demonstrate that he gave value."

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002)

(internal quotations omitted).  In essence, there must be (1) good faith on the part of the transferee-

obligee and (2) an exchange for value.  *See Brandt v. Charter Airlines, LLC (In re Equip. Acquisition*

*Res., Inc.)*, 511 B.R. 527, 536 (Bankr. N.D. Ill. 2014).  The defendants stand as obligees of the AHF

guaranties and transferees of the preferential payments.  The defendants gave value in the form of their

respective investments; and such value was given in exchange for the benefits expected from the deals.

     42.     For good faith, the Fifth Circuit and other courts have set forth guidelines to follow in

assessing a transferee's good faith.  *Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 F. App'x 516

(5th Cir. 2013);[3] *Hannover*, 310 F.3d at 800; *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 310–12 (S.D.N.Y. 2010).  In the Fifth Circuit, courts should "look to whether the claimant was on notice of the debtor's insolvency or the fraudulent nature of the transaction."  *Horton*, 544 F. App'x. at 520.

> The good faith test under Section 548(c) is generally presented as a two-step inquiry. The first question typically posed is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose. While the cases frequently cite either fraud or insolvency, these two elements are consistently identified as the triggers for inquiry notice. The fraud or insolvency predicate is set forth in countless cases....
>
> ... The weight of the authority ... indicates that a court should focus on the circumstances specific to the transfer at issue—that is, whether a transferee reasonably should have known ... of the fraudulent intent underlying the transfer.
>
> Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a "diligent investigation" requirement.

*Id.* (quoting *Bayou Grp.*, 439 B.R. at 310–12); *see also Hannover*, 310 F.3d at 800.

43.     The first step of the analysis requires the Court to consider the transferee's state of mind at the time of the transaction.  *Hannover*, 310 F.3d at 800.  The Court interprets this good faith test in light of the statutory requirements set forth in § 548(a)(1)(A) and (B).  The Court considers the fraudulent purpose component as an inquiry of the transferee's knowledge—whether the transferee knew or should have known of the transferor's intent to defraud the other creditors, as required by § 548(a)(1)(A).  Likewise, the Court construes the insolvency component as arising from the constructive fraud requirement of § 548(a)(1)(B).  *See O'Cheskey v. Herring Nat'l Bank (In re Am. Hous. Found.)*, 520 B.R. 208, 231 (Bankr. N.D. Tex. 2014).

44.     Each defendant's relationship with Templeton, whether Templeton was an agent or not, is relevant to the extent that it clarifies each defendant's state of mind at the time of the deals.

---

[3] The Fifth Circuit determined that the opinion should not be published and is not precedent except under limited circumstances.  Be that as it may, the Court agrees with the analysis provided as it is consistent with relevant case law.

a. <u>Insolvency</u>

45. The evidence before the Court does not confirm that any of the defendants knew or should have known that AHF was insolvent at the time of the deals. Sterquell was the only party with knowledge of the inner workings of AHF, as he had complete control of the operation of its assets and management of its accounts. It was highly unlikely that an investor could discern AHF's insolvency.

b. <u>Fraudulent Purpose</u>

46. A closer view is necessary to determine whether the defendants knew or should have known of AHF's intent to defraud other creditors.

47. King is a retired dentist who managed his own investments, consisting of stocks and certificates of deposit. Given his experience handling his investments and retirement income, King was aware that the return promised by Sterquell was much higher than anything he could find on the market. Though he may not have fully understood the panoply of benefits his investment entailed, he was aware of and wanted the tax benefits that were part of his investment in Walden II.

48. King knew or should have appreciated that the deal was absurdly beneficial. Despite this, the Court is satisfied that he had no knowledge of any intent by Sterquell (or AHF) to defraud other creditors. His meeting with Sterquell that culminated with his handing over $300,000 to Sterquell lasted less than an hour; he relied on Templeton's endorsement. The Court finds that King satisfies the good faith element under § 548(c).

49. There is also no showing that Frances Maddox, at the time of the transaction, knew or should have known of AHF's intent to defraud its creditors. Templeton, who served as a lawyer for Mrs. Maddox and her husband for 50 years, was an agent of Mrs. Maddox at the time she made the deal with AHF. But at the time she entered into the transaction, she was also advised by Don Buckley, her financial advisor. The evidence does not confirm that she knew or should have known of AHF's intent to defraud other creditors.

50.     Like King and Maddox, the Court concludes that Heron was neither aware nor should have known of any fraudulent intent of AHF. Unlike defendants King and Maddox, Templeton was in complete control of Heron at the time of its investments. Templeton was the president of Heron and made the decision for Heron to invest in Walden II. Templeton's knowledge is imputed to Heron; Templeton's knowledge and complicity with Sterquell regarding tax deals did not defraud other creditors of AHF.

c.   Value from Defendants to AHF

51.     In determining the nature of the deals here, the Court has construed each one as an integrated whole. This has resulted in the Court's characterization of each deal as an equity investment. AHF asserted control over the invested funds and directed the use of the funds. And this was done for the benefit of the AHF enterprise. Given the approach taken by the Court in determining the nature of the deals, it is only fair to take the same approach in determining whether AHF received value in return for the guaranties. *See* 5 *Collier on Bankruptcy* ¶ 548.03[6] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2014).[4] This is consistent, moreover, with the Court's conclusion that the payments *to* the defendants from the AHF-D account were from AHF as the entity asserting dominion and control over such funds. The Court therefore concludes that the value given by each of the defendants here resulted in sufficient value to AHF for the guaranty obligations of AHF.

52.     The investments made by the defendants well exceed the payments that were made to each of the defendants. For purposes of assessing value provided, the payments are deemed to have been made in satisfaction of an antecedent debt. *See Koehler*, 499 B.R. at 540–41; *see also* 5 *Collier* ¶ 548.04[3][c].

53.     Each of the defendants satisfy the good faith defense under § 548(c).

---

[4] It states there that "if affiliated entities are functionally identical such that bestowing value to one equates to giving value to the other, courts have held that funds advanced to one will be equivalent value for a payment made or security interest given by the other, effecting a form of consolidation or alter ego analysis." *Id.* (citations omitted).

**Insider Status of Defendants**
**(For Preference Charge)**

54.     The defendants' investments did not make them insiders of AHF; Templeton's involvement did not avail any of the defendants any degree of control over AHF and its activities. They cannot therefore be considered insiders for purposes of any alleged preferential transfers.  *See* 11 U.S.C. § 547.

## Conclusions

55.     The defendants' claims resulting from the described deals are subordinated.  *See* 11 U.S.C. § 510(b); *see also Templeton*, 2013 WL 1316723, *18.

56.     The Trustee's preference cause of action for payments made within one year of the AHF bankruptcy filing is denied.  (No payments were made within 90 days of the filing.)

57.     In light of the Court's rulings, it is not necessary to address the balance of the issues before the Court.

58.     The issues here raise mixed questions of fact and law.  Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Findings of Fact and Conclusions of Law ###